**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

             Plaintiff,

vs.

CARL McARTHUR,

             Defendant.

No. 18-CR-102-CJW-MAR

**ORDER**

_____

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................. 2

II.    ELEMENTS.................................................................................... 2

III.   LEGAL STANDARDS................................................................... 4

IV.   TRIAL TESTIMONY .................................................................... 4

        The 911 Call and Police Response ................................................ 4

        Sara Lyon's Testimony.................................................................... 9

        Jared Evans' Testimony.................................................................. 11

        Blayze Harding's Testimony ......................................................... 13

        Statements by Defendant................................................................ 16

V.    ANALYSIS................................................................................... 18

VI.   CONCLUSION   ...........................................................................28

## *I.    INTRODUCTION*

Defendant Carl McArthur waived jury trial and I found defendant guilty after conducting a bench trial on May 14 and 15, 2019.

In an indictment, a grand jury charged defendant in one count with possession of a firearm by a prohibited person, in violation of Title 18, United States Code Sections 922(g)(1), 922(g)(9), and 924(a)(2).   (Doc. 2).   Specifically, the indictment alleges that defendant was prohibited from possessing a firearm because he was convicted of both a felony and a misdemeanor crime of domestic violence.   The indictment alleges that defendant possessed a Taurus Model 45-410 .45 caliber revolver on or about March 17, 2018.

At the conclusion of the evidence on the morning of May 15, 2019, defendant combined his motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure with his closing argument on the merits.   I took defendant's motion and the case under advisement.   On May 16, 2019, I announced my verdict in open court.   When I began to provide an oral explanation for my verdict, however, defendant began yelling and became disruptive.   When defendant refused to settle down, I ceased attempting to provide an oral explanation and recessed court.   Pursuant to Federal Rule of Criminal Procedure 23(c), I now state my specific findings in a written decision.

## *II.    ELEMENTS*

The crime of being a prohibited person in possession of a firearm has three elements, which are:

> *One*, defendant was prohibited from possessing a firearm, in this case either because he had previously been convicted of either (a) a crime punishable by imprisonment for more than one year or (b) a misdemeanor crime of domestic violence;

*Two*, after that, defendant knowingly possessed a firearm, in this case a Taurus Model 45-410 .45 caliber revolver; and

*Three*, the firearm was transported across a state line at some time during or before the defendant's possession of it.

EIGHTH CIRCUIT MODEL CRIMINAL INSTRUCTION 6.18.922A; 6.18.922C. Defendant stipulated that he had previously been convicted of both a felony offense and a misdemeanor crime of domestic violence. Exhibit 23. Specifically, defendant stipulated that on November 20, 2009, defendant was convicted of the felony offense of being a prohibited person in possession of a firearm in the United States District Court for the Northern District of Iowa, in case number 09-CR-3-1-LRR.[1] He further stipulated that on June 9, 2003, he was convicted of the misdemeanor crime of Assault Causing Bodily Injury (Domestic Abuse), in the Iowa District Court for Linn County, in case number SRCR51361-0603. Defendant further stipulated that the firearm was transported across a state line at some time during or before he possessed it. *Id.* Thus, the only element at issue during the trial was whether defendant knowingly possessed the firearm.

---

[1] The stipulation was not an *Old Chief* stipulation. In *Old Chief v. United States*, 519 U.S. 172, 190 (1997), the United States Supreme Court held that when a defendant offers to stipulate to being a felon for purposes of 18 U.S.C. § 922(g)(1), then the government cannot introduce into evidence the nature of the felony offense. Here, the parties' stipulation included the nature of the prior conviction; that is, that defendant was convicted of possession of a firearm as a prohibited person. Under Rule 404(b) of the Federal Rules of Evidence, a prior conviction for possession of a firearm is admissible to show knowledge and intent in another prosecution for possession of a firearm. *See, e.g.*, *United States v. Williams*, 796 F.3d 951, 959-60 (8th Cir. 2015) (collecting cases). Thus, I could have considered defendant's prior conviction for possession of a firearm in determining whether defendant knowingly possessed the firearm in this case. Here, though, the government did not urge the Court to consider defendant's prior conviction for that purpose and so, out of an abundance of caution, I did not do so.

### *III.  LEGAL STANDARDS*

It is undisputed that the government bears the burden of proving each element of each charge beyond a reasonable doubt.  It is useful to review and consider the standard explanation of "reasonable doubt" provided to jurors, a standard that is equally binding on me as a fact-finder:

> Reasonable doubt is a doubt based upon reason and common sense, and not doubt based on speculation.  A reasonable doubt may arise from careful and impartial consideration of all of the evidence, or from a lack of evidence.  Proof beyond a reasonable doubt is proof of such a convincing character that a reasonable person, after careful consideration, would not hesitate to rely and act upon that proof in life's most important decisions.  Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.  Proof beyond a reasonable doubt does not mean proof beyond all possible doubt.

EIGHTH CIRCUIT MODEL CRIMINAL INSTRUCTION 3.11.

Defendant's motion for judgment of acquittal is governed by Federal Rule of Criminal Procedure 29, which provides: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  FED. R. CRIM. P. 29(a).  Sufficient evidence exists to support a verdict if "'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Jiminez-Perez*, 238 F.3d 970, 972 (8th Cir. 2001) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

### *IV.  TRIAL TESTIMONY*

**The 911 Call and Police Response**

At approximately 9:25 AM, on Saturday, March 17, 2018, the Cedar Rapids Police Department received a 911 call.  In a soft voice, a female stated she needed an

officer and gave the address of a home on 20th Street in Cedar Rapids, Iowa. She then hung up. Exhibit 1A. The 911 operator called the number back and after a few rings a female answered the telephone. When asked by the operator what the nature of the emergency was, the female only repeated the address and hung up. Exhibit 1B.

Cedar Rapids Police Officer Gary Idle, a twenty-year veteran of the department, was on patrol nearby the reported location and was the first officer to respond to the scene. He arrived within a few minutes of the 911 call. Although he activated the emergency lights on his patrol car when responding to the house, he did not activate the siren on his vehicle. Officer Idle was familiar with the house, having been there on several occasions in response to domestic disturbance calls. He had never before found a firearm or evidence connected to a firearm there.

The house was extremely small. Exhibit 5. Officer Idle estimated that the first floor was less than 600 square feet. The front door opened into a small living room that the officer estimated was ten feet by ten feet. Directly across the living room from the front door was a doorway into the kitchen. Exhibit 7. In the kitchen were stairs leading to the basement. Inside to the right of the front door was a chair, an end table, and a couch. To the left was a doorway into the only bedroom on the main floor, and through that bedroom was a bathroom. The distance from the front door to the entrance into the bedroom was approximately six feet.

Officer Idle was aware that Sara Lyon lived in the house. Officer Schrader arrived at the house at about the same time as Officer Idle. Officer Idle observed several cars parked on the street outside the house and noticed that a maroon car was running, although he did not see anyone in the car.

As Officer Idle approached the house, he heard a "verbal disturbance" inside. Officer Idle knocked on the front door, announced that he was a Cedar Rapids Police Officer and stated something to the effect that he was making a welfare check. No one

came to the door.   The front door was already open about a foot.   Officer Idle could see one white man sitting on a chair inside.   Officer Idle placed his foot against the front door.   After he knocked and announced his presence, Officer Idle then felt someone pushing against the door, as if to shut it.   At that point, Officer Idle forced the door back and entered the room.   Officer Schrader entered the house behind Officer Idle.   Inside the living room Officer Idle found a second white male sitting behind the door and the defendant, a black male, standing in the center of the room.   Officer Idle also testified that he saw two white males sitting in the bedroom.[2]

Officer Idle testified that everyone except defendant was sitting.   Officer Idle testified he knew defendant from previous encounters.   He testified he had never before met the three white males in the house.   They were later identified as Jared Evans, Joshua Webber, and Blayze Harding.   Officer Idle testified that the white males remained quiet and appeared scared and only defendant said anything.   Officer Idle testified that defendant appeared agitated.

Officer Idle testified that once inside the house he asked who called 911.   Defendant denied that anyone there called 911.   Officer Idle testified that he knew the 911 caller was a female and knew that Sara Lyon lived there.   Officer Idle asked where Sara was and someone told him that she was in the basement.   Officer Idle stated that he stepped across the living room and stood in the doorway to the kitchen.   From there, Officer Idle called out for Lyon by name.   Lyon yelled back that there was a black male

_____

[2] Officer Idle's testimony about whom he saw where in the house was disjointed.   He testified to having seen only three white males in the house.   Yet, he testified that he saw one white male in a chair, another white male behind the door, and two white males in the bedroom.   On cross examination, Officer Idle testified it was possible some of these males moved locations after he entered the house.   This explanation is consistent with Evans' testimony that he moved from the living room to the bedroom after officers entered the house.

in the house with a gun and came up the stairs and into the front room.[3]

Officer Idle stepped outside to tell Officer Schrader there was a possible gun involved. Officer Schrader at some point had stepped outside and was talking to another black male.[4] At that point Lyon said "no, not that guy; it's the guy inside that's got the gun."[5] Officer Idle then placed defendant under arrest. Officer Idle searched defendant

---

[3] Defendant objected to Officer Idle's testimony about Lyon's response as hearsay. The government responded that it was not offering her statement for the truth of the matter asserted, but to explain the officer's subsequent actions. The Court therefore overruled the objection and did not consider Lyon's statements for the truth of the matter asserted. The statements, however, would likely have been admissible for the truth under at least one exception to the hearsay rule. A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it, is an exception to the hearsay rule. FED. R. EVID. 803(1). In this case, Lyon described defendant possessing a gun shortly after having seen him with it. Although it is possible that she was merely passing along information she heard from another, that is unlikely because she later specified to Officer Idle that it was defendant who had the gun and not the other black male on the scene, who was outside the house. The statement also was likely admissible as an excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement that caused it is another exception to the hearsay rule. FED. R. EVID. 803(2). In this case, Lyon had called 911, a classic example of a person in an excited state. The event that caused her excitement was a man in her house with a gun. Officer Idle was not asked to describe Lyon's demeanor at the time she made the statement to solidify that she was still in an excited state, but the circumstances at the time would strongly suggest that she would still have been in an excited state. Nevertheless, since the government did not offer the statement for the truth of the matter asserted, the Court did not consider it for the truth.

[4] Officer Idle testified that he did not see a second black male in the house, but all of the other evidence points to a second black male being in the house at the time police arrived. Both Evans and Harding and defendant stated that there was a second black male in the house wearing a ski mask. A ski mask was found on the ground outside near where Officer Schrader was speaking to the second black male. Officer Idle testified that there had not been anyone outside the house when he entered the house. Evans and Harding testified that the second black male slipped outside the front door after the officers made entry into the house. Officer Schrader might have been able to clear up this discrepancy, but was not called to testify.

[5] Defendant also objected to this statement as hearsay. The government responded that this statement was also not offered for the truth of the matter asserted, and the Court admitted the statement subject to that limitation. Upon consideration, the Court finds that this is a statement

incident to arrest. In defendant's pockets Officer Idle found two packages of suspected methamphetamine. Exhibits 2 & 3. Both later tested positive for methamphetamine. Exhibit 4. Officer Idle did not find any firearms, holster, ammunition or other firearm-related items on defendant, nor did Officer Idle find any cash on defendant.

Officer Idle escorted defendant to his patrol car and Mirandized defendant. Defendant told Officer Idle that he did not live at the house. Defendant told Officer Idle that he came in the maroon vehicle and came there to buy ice methamphetamine. Defendant told Officer Idle that he had an argument with the people inside the house over $100.

Officer Idle testified that one of the other subjects present (whom he did not further identify) indicated to one of the other officers on the scene that there was a gun in the small bedroom on the first floor. With Lyon's consent, Officer Idle began searching that room. A laundry basket full of clothes was located just inside to the left of the doorway into the bedroom immediately off the living room. Officer Idle removed some of the clothes on top of the pile and discovered a loaded black pistol. Exhibit 8. At that point, Officer Idle stopped the search so that a search warrant could be obtained.

During the subsequent execution of the search warrant, officers found a Taurus Model 45-410 .45 caliber revolver. Exhibit14. The handgun is known by the name "The Judge" and is capable of shooting both 410-gauge shotgun shells and .45 caliber bullets. The revolver is black with an orange front site on the barrel, and a ribbed rubber grip on the handle. Officers found the revolver beneath a blanket in the bedroom on the main floor of the house, somewhat opposite the door to the bedroom and the laundry basket where officers found the other firearm. Exhibits 11-13. The revolver was

---

of identification made by a declarant who testified and was subject to cross-examination. *See* FED. R. EVID. 803(d)(1)(C). As such, the statement is not hearsay and the Court can and will consider it for the truth of the matter asserted.

loaded with red 410-gauge shotgun shells.

During the search of the house officers also found marijuana (Exhibit 17), a small package of methamphetamine next to a backpack (Exhibit 18), a package of methamphetamine in the toilet bowl in the bathroom off of the bedroom (Exhibit 19), and scales (one of which, located under the end table in the living room, was entered into evidence as Exhibit 21). Apparently officers did not search a backpack found in the living room or a blue backpack located in the bedroom.[6] Also present in the house was a torch on the living room coffee table (consistent with using controlled substances), a bong, pipes for smoking controlled substances, a tube straw on a plate in the living room, a mirror with drug residue in the kitchen, and multiple baggies with the tops ripped off, which are consistent with someone retrieving controlled substances from inside. All of the drugs found were consistent with user quantities.

**Sara Lyon's Testimony**

Sara Lyon testified that on March 17, 2018, she was living alone in the house on 20th Street, in Cedar Rapids, Iowa. She had lived there less than a year. She used a room in the basement as her bedroom. She allowed many people to stay overnight in her house from time to time. She had been allowing a female friend named Rudy to stay in the bedroom on the main floor, but Rudy was out of town on March 17, 2018.

Lyon knew Blayze Harding. She had known him for about a year and a half. Harding spent time at her house off and on. She knew Harding to be a methamphetamine addict. Lyon testified that on the night of March 16, 2018, Harding came to the house and fell asleep on a chair in the living room and she went to sleep in the basement.

Lyon testified that she knew Jared Evans and had known him for a couple months. She stated that he sometimes stayed at her house, but mostly lived with his parents. She

---

[6] Officer Idle testified that Webber kept reaching into the blue backpack and Officer Idle had to tell him to stop several times. Yet, officers apparently never searched the backpack.

claimed he used methamphetamine in the past, but that he was on probation in March 2018 and had been clean as far as she knew. She testified that Evans was in her house on March 17, 2018, and that he was probably doing some home repair work for her.

Lyon testified that she knew Joshua Webber and had known him for about a year. Lyons stated that Webber had just arrived in town and that Lyon's boyfriend had brought Webber to her house sometime on March 16, 2018.

Lyon testified that she knew defendant and that he had been at her house several times before March 17, 2018. Lyon considers defendant a friend. Lyon stated that she knew defendant to use methamphetamine. Lyon testified that on March 17, 2018, defendant was at her house. Her testimony was imprecise, but Lyon indicated that defendant came to and went from her house more than once that morning. At some point defendant came to her room in the basement, seemed "frustrated," and asked her for money. Lyon testified that defendant did not demand money; just asked for some. Lyon claimed she did not see defendant in possession of a firearm.

Lyon testified that at some point on March 17, 2018, she heard fighting upstairs. She could not tell who was arguing and could not "make out" any of the argument. She testified it was common to hear arguing and fights in her house. Nevertheless, Lyon testified that she called 911 only because of the arguing. Lyon had never before called 911 over arguing in her house.

Lyon testified that at some point Harding said someone had a gun, but did not say who. Lyon denied seeing any gun. Lyon denied that she told the police officer that she had seen defendant in possession of a firearm. She testified that she never has guns in her house. She testified she has never seen Harding with a gun.

Lyon testified that she was not surprised officers found methamphetamine in her house as she and people who came to her house were all methamphetamine addicts. Lyon has theft convictions from 2015, 2016 and 2018, and was on probation on March

17, 2018. Lyon knew it would be a violation of her probation to have methamphetamine in her house.

### Jared Evans' Testimony

Jared Evans testified that he lives with his parents. Evans suffers from a neurological disorder as a result of lead paint exposure as a child. He testified that it does not affect his mental abilities or memory other than he has difficulty with language, forming and pronouncing words. Evans graduated from high school. Evans receives benefits because of his disability. Evans' mother serves as his legal guardian. Evans makes money doing odd jobs for people, such as car repairs, plumbing, mowing lawns and shoveling snow. Evans has two felony marijuana convictions and was on probation on March 17, 2018. He denied using methamphetamine.

Evans initially denied knowing Harding, but later admitting knowing Harding. Evans explained that he sometimes drove Harding around because Harding does not have a valid driver's license, and that Harding showed him how to fix cars. Evans stated that Harding sometimes paid Evans for work Evans did working on cars and for driving Harding around.

Evans stated that he was at Lyon's house on March 17, 2018, to work on plumbing, explaining that there was a leak near a water heater in the basement. He stated he had been there once before, the prior day, to look at the plumbing problem. Evans testified that his mother had given him a ride to Lyon's house both on the morning of March 17, 2018, and the prior evening. Evans stated that Webber (whom he had never met before) and Harding were there on the morning of March 17, 2018, when he arrived at approximately 7:00 AM. Evans denied seeing drugs and drug paraphernalia in the house, but stated that he was not paying attention because he focused on the plumbing repairs in the basement.

Evans stated that he was just about to leave Lyon's house on the morning of March 17, 2018, to purchase plumbing equipment to complete the repairs when someone knocked on the front door.[7]  Evans testified that he unlocked the front door and opened it.  Two black men, both carrying firearms, entered the house.  Evans identified defendant as one of the two black men.  Evans testified he had never seen defendant before.  The other black man was wearing a black ski mask.  Evans testified the men demanded money.  They told everyone "don't leave and stuff."  Evans said he then sat on the ground.  He stated he was shocked and tried after that not to pay attention, afraid he was going to be shot.  Evans testified that he was holding Lyon's dog because the dog was upset and trying to attack the two men.  Evans said he was afraid the dog would be shot.  Evans stated that defendant went in and out of the house "a lot," perhaps as many as five or six times, between the time defendant first entered and when the police arrived.  During one of the trips back into the house defendant brought in a backpack.

Evans testified that Harding was sleeping on the couch, curled up like a baby, when the men with the guns entered the house.  Evans referred to Harding as a "fat fuck" and claimed he did not know Harding's name.  Evans later explained, however, that Harding sometimes called Evans a retard because of the way Evans talked and Evans would respond by calling Harding a "fat fuck."

Evans testified that, although it felt longer, the police officers likely arrived at the house approximately ten minutes after the armed men entered.  Evans stated that he felt someone barging against the door and that the two black men tried to shut it.  Evans then

---

[7] Evans testified that he was going to borrow someone's vehicle to drive to the store and got the keys from the counter.  Lyon told Evans it fit a vehicle outside.  Evans testified the vehicle was a truck.  Harding drives a truck, but it starts with a screwdriver.  Evans testified, however, that Harding's truck starts with a key.  It was unclear from the testimony whether Evans believed the keys were to operate Harding's truck or some other truck.  Evans answered affirmatively to a compound question on cross examination which implied he believed the keys were to Harding's truck, but Evans was never asked that direct question.

moved into the room and sat on the couch or bed. Evans explained that he was afraid of being shot by either the police or the armed men. Evans testified that he did not see what the men did with their guns when police arrived, but stated that the men were moving about the house after the police announced their presence. Evans saw defendant go into the bedroom. Evans stated that the other black male walked past the police officers and out the front door, but he did not see how it happened. Evans testified that after the police arrived Lyon came upstairs and spoke with the police.

The prosecutor showed Evans Exhibit 14 and asked if he recognized it. Evans identified Exhibit 14 as the handgun defendant was holding. Evans recognized the firearm because of its size ("the big old looking thing on it").[8] Evans identified Exhibit 15 as the handgun held by the other black man.

Evans testified that his mother drove him to the police station after the police released him from Lyon's house. Evans stated that police were still at the house after he gave his statement to police when he returned to Lyon's house to retrieve his telephone. Evans could not recall whether officers showed him photos at the police station, but testified that the prosecutor later showed him a photo of defendant. That was the first time Evans learned defendant's name.

**Blayze Harding's Testimony**

Blayze Harding testified while in custody. Harding is in prison for felony eluding (driving 90 mph in a 55-mph zone with his three-year-old son in the car). Harding admitted that he had multiple prior felony convictions, including for burglary, driving while barred multiple times, and theft by deception.[9] Harding testified that the

---

[8] Exhibit 14 is an unusually large and menacing-looking firearm.

[9] The defense attorney cross-examined Harding at length about the theft by deception conviction. Harding took money twice from an elderly woman in Nebraska promising to perform some work for her. Although Harding performed some of the work, he did not complete the work and kept

government had not promised him any benefit in exchange for testifying, such as a reduction in his sentence, nor had the government threatened him with prosecution if he did not testify.

Harding testified that he had known Jared Evans for three to four years. They met through a mutual friend. Harding has been to Evans' house and was aware that Evans lives with his mother. Harding has paid Evans to work on Harding's truck and to drive Harding around in Harding's truck because Harding does not have a valid driver's license. Harding owns a truck that starts with a screwdriver. Harding testified that Evans tries to do plumbing and other fix-it jobs. Harding did not know whether Evans was under a guardianship and recognized that Evans has a speaking impediment, but was unaware of any other mental difficulties.

Harding testified that he had known Lyon for about a year. Harding had been to Lyon's house on five or six prior occasions within the last couple months, and would periodically stay overnight at her house because he was largely homeless. Harding stated that he came to Lyon's house on the night of March 16, 2018, at approximately 8:30 PM, after three to four days of being awake during a binge of methamphetamine use. Harding stated that Evans drove Harding to Lyon's house that night in Harding's truck. Harding testified that Joshua Webber was not in the house when Harding arrived, but was there the next day. Harding stated that he had not met Webber before. Harding testified that he fell asleep on a couch in the living room almost immediately after arriving at Lyon's house. Harding stated that he sleeps with his arms across his chest, holding himself.

---

the money. Harding understood that those facts were enough to show he was guilty; defense counsel believed the government would have needed to prove an intent to deceive the elderly woman. Harding would not admit that he had that intent, but admitted that he committed the crime of theft by deception. In closing argument defense counsel emphasized this exchange as indicative of Harding's untruthfulness. I found it more likely the product of Harding's misconception of the law and the elements of theft by deception.

Harding testified that Evans was still at Lyon's house when Harding fell asleep and was there the following morning when Harding was awakened. Harding stated that when he arrived Lyon only had "weird strobe lights" on and that Harding did not look around much to see what kind of drug paraphernalia might be present. Harding admitted, however, that he had used methamphetamine at Lyon's house on prior occasions. Harding considered Lyon's house a "trap house," which he understood to be a term used to describe a house where drug addicts live.

Harding testified that on the morning of March 17, 2018, he was awakened by defendant pressing a knee on Harding's chest and sticking a gun in Harding's face. Harding knew defendant because he met defendant at Lyon's house a few days before March 17, 2018, and bought some tools from him. Harding described the gun as a revolver with red bullets, which he recognized as 410 shotgun shells. Harding had seen this type of firearm before. When the prosecutors showed Harding Exhibit 14, Harding testified that he recognized that as the kind of gun defendant pointed at him and knew it was called a "judge."

Harding testified that as defendant was pressing the gun into Harding's mouth defendant demanded all of Harding's money or he was going to blow Harding's head off. Harding responded that he did not have any money, that it was his birthday, and that he did not want to die. Harding saw another black man with dreadlocks in a ski mask lining others up by the door at gunpoint. Harding saw the other man had a square, black gun. Harding testified that defendant went into the kitchen to heat up a pan of grease left over from breakfast, threatening to pour it on Harding if Harding did not tell him where the money was. Harding recalled that defendant left the house at one point and then re-entered the house.

Harding recalled that police officers knocked on the door and announced they were there for a welfare check. Harding testified that defendant and the other black male

"darted" into the bedroom and when they re-emerged they no longer had firearms. Harding did not see anyone try to shut the door on the officers. Harding stated that after the officers entered the house the other black man (no longer wearing the ski mask) went out the front door and an officer went outside with him. Defendant remained in the house standing in front of Harding. When officers placed defendant under arrest, Harding heard defendant accuse Harding of being a drug dealer. Harding denied being a drug dealer.

Harding testified that before the police arrived, Evans was kneeling on the floor, pleading for his mother and perhaps crying. Harding believed that Lyon's dog remained in the basement with her. Harding did not recall Webber or Evans moving from the living room when officers entered the house.

Before Harding left the house he promised the police he would come to the police station and provide a statement. Harding claimed he had to get to Nebraska for court the next day,[10] however, and so called the police by telephone later that day instead. Harding testified that the police officers told him it was not mandatory that he come to the police station. When Harding left Lyon's house he gave Webber a ride.

Sometime after this event (exactly when, he could not remember), Harding claimed he was coming out of a friend's apartment when defendant confronted him. Harding testified defendant pulled another gun on him and asked Harding if Harding had told on defendant. When Harding denied doing so, Harding claimed defendant put the gun away and left.

### Statements by Defendant

After defendant's arrest, still on March 17, 2018, Investigator Michael Bailey questioned defendant at the police station after providing defendant a Miranda warning. Investigator Bailey stated that defendant was "jittery" and could not keep his hands still.

---

[10] The next day, March 18, 2018, was a Sunday.

In Investigator Bailey's opinion, it appeared defendant was under the influence of methamphetamine. Defendant stated that he had been at Lyon's house twice. Defendant stated he went to the house to purchase methamphetamine. Defendant told Investigator Bailey that "Tina" took him to the house on both occasions. Defendant believed Tina was a cousin to "Blayze, who lived there." Defendant told the investigator that when he arrived the second time another person was waiting at the door like the person was coming "shopping," which the investigator understood to mean shopping for drugs. Defendant told the investigator that on the second trip to the house, defendant got into an argument about the size of the 8-ball of methamphetamine he was purchasing. Defendant denied having a gun with him. Defendant told the investigator he had seen guns in the house before, but not on March 17, 2018. Defendant did not say who had possessed the firearms in the house on the prior occasion.

On April 12, 2018, FBI Task Force Officer John O'Brien interviewed defendant a second time about the incident on March 17, 2018. The interview took place in the Linn County Jail. After receiving a Miranda warning, defendant agreed to talk about the incident. Defendant again stated he had been to Lyon's house twice on March 17, 2018. He stated that the first time he purchased methamphetamine and returned a second time to settle up a debt he had with Harding. Defendant told Officer O'Brien that he went to the house with a male named George and a female named Tonia. Defendant did not say whether George went into the house. Defendant told Officer O'Brien that he left the house once to come back out to the car occupied by George and Tonia to give them something to smoke. As for the other black male in the house, defendant claimed to Officer O'Brien that when he arrived the second time at the house on March 17, 2018, that male was in the kitchen. When Officer O'Brien asked why that male would be wearing a ski mask, defendant stated that he believed that male was Harding's hitman. Defendant opined that that male ran from the scene because he did not have bond money.

Regarding firearms, the prosecutor asked Officer O'Brien whether defendant stated whether defendant knew there were firearms in the house "that day." Officer O'Brien replied that defendant explained that he knew Harding to have firearms, that Harding possessed a Desert Eagle, a 410, and a Glock. When asked whether defendant stated whether he had seen any of those firearms on "that occasion," Officer O'Brien replied that defendant stated they (presumably defendant and Harding) had sat around smoking methamphetamine and they were passing the guns around. On cross examination, however, Officer O'Brien testified that defendant did not provide a specific date when he had seen Harding in possession of other firearms. Officer O'Brien clarified on redirect examination that he understood defendant's description of handling the firearms referred to a date before March 17, 2018.

Officer O'Brien asked defendant whether there would be any reason defendant's fingerprints would be on the 410 and defendant admitted he had handled that firearm. Defendant referred to the 410 having a rubber grip. The 410 revolver in this case has a rubber grip. Officer O'Brien testified that the 410 was tested for fingerprints but no identifiable prints were found, and that the firearm was not tested for DNA. Officer O'Brien testified that defendant would not have had access to any discovery materials regarding this incident before Officer O'Brien's interview of defendant on April 12, 2018.

## V.    ANALYSIS

This is a close case. It is possible defendant did not possess the firearm on March 17, 2018, as charged in the indictment. It is possible that he was at the house to purchase methamphetamine and that the firearm belonged to Harding. But I find it to be only possible. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt. *See United States v. Anderson*, 78 F.3d 420, 422 (8th Cir. 1996) ("The evidence need not exclude every reasonable hypothesis of innocence, and we may not disturb the

conviction if the evidence rationally supports two conflicting hypotheses."). Based on the totality of the evidence, I am firmly convinced of defendant's guilt.

I start my analysis with the 911 call. The evidence shows that Sara Lyon made the 911 call from the basement of her home. I find her call is consistent with someone who was very frightened. Lyon whispered her address and asked for an officer, and nothing more, during the initial call. When the 911 operator called back, after several rings Lyon answered and again only whispered her address and nothing more. Lyon testified that she called 911 because she heard a verbal disturbance upstairs. Were that the case, I would have expected the tone of the 911 call to be remarkably different. Lyon would have had no reason to whisper and no reason not to further explain to the operator why she wanted police to come to her home. Lyon testified that there had been many fights in her home and she had never before called 911. Lyon was also on probation and knew there was likely drugs and drug paraphernalia in her house. She also knew having drugs and drug paraphernalia in her house would be a violation of her probation. It must have been a frightening event indeed that compelled Lyon to risk a probation violation to call police to her house full of drug evidence.

Thus, I did not find Lyon credible when she testified at trial that she did not see defendant with a gun and did not tell the police otherwise. I find more credible her statement on March 17, 2018, that defendant was the person who had the gun. I also consider Officer Idle's testimony regarding Lyon's statements that day as impeaching of Lyon's credibility regarding her claimed lack of knowledge of defendant's possession of a firearm. The nature of Lyon's 911 call, combined with Lyon's testimony that defendant came to her room in the basement and asked her for money, Lyon's identification of defendant on the scene as the one who possessed the gun, and the fact that Lyon had not called 911 until after defendant arrived at the house, all lead me to conclude that Lyon likely saw defendant in possession of the firearm and that she was

aware that he was brandishing it or using it in some way to commit a crime that frightened her enough to risk being caught violating her probation by calling 911.

Both Evans and Harding positively identified defendant as possessing the same 410 revolver at issue in the indictment. That direct evidence is sufficient to convict defendant unless there was evidence to persuade me to reject their testimony as not credible. Although there were inconsistencies in their testimony, both with each other and with other evidence, I generally found their testimony regarding defendant's possession of the revolver credible.

In assessing Evans' credibility, one must consider his neurological brain injury from lead poisoning. Having personally witnessed Evans testify, I found him to be credible and competent. He clearly had difficulty speaking, sometimes speaking in broken sentences in a manner that made some of his testimony hard to comprehend. I did not detect any problems with his memory, however, or in his reasoning. At one point, Evans even corrected defense counsel on the time of day the incident occurred. Although I had some concerns about whether Evans was impressionable and could be led by others to make statements at their direction, it never rose above a concern. For example, this was not a case where Evans gave one version of the story when questioned by the government, then another version when questioned by defense counsel. He was not easily led by the questioners in the case. In sum, I detected nothing in the evidence that Evans had been led by others to present an untruthful story.

The evidence showed that Evans went to the police department immediately after the incident and provide the police with a statement of what occurred. Although the parties did not introduce that statement as evidence in the trial, nor did defense counsel use that statement to impeach Evans' testimony with prior inconsistent statements. Thus, I can only conclude that whatever Evans told the police immediately after the incident was consistent with how he testified at trial. Officers had not yet found the revolver at

the house by the time Evans provided his statement. Nor is there any evidence that Evans would have had knowledge of what officers found or did not find in the house. Indeed, nothing in the evidence suggested that Evans was even aware that police officers were going to search the house.

Evans clearly and unequivocally identified defendant as one of two men that entered Lyon's house armed with a firearm. When the prosecutor showed him a firearm, Evans positively identified Exhibit 14 as the revolved held by defendant. Evans identified the other firearm, Exhibit 15, as one resembling the firearm held by the other black male. Evans testified that after police announced their presence, defendant and the other black male moved about the house looking for a way out and entered the bedroom where the guns were ultimately found.[11]

Evans had no clear motive to lie. There was nothing in the evidence that Evans ever possessed any firearm, had been accused of possessing a firearm, or had a motive to accuse someone else as possessing the firearms. The evidence did not establish that the government had made Evans any promises or gave him any benefit for testifying, nor that the government threatened him with prosecution or revocation of his probation if he did not testify.

I found Harding less credible. Some of his testimony, such as accusing defendant of heating up grease on the stove, I found to be a highly unlikely embellishment. I found his denial of having anything to do with scales and methamphetamine found in the house to be an implausible denial. Harding's explanation that he did not go to the police station because he had to be in court in Nebraska the following day, a Sunday, I found to be untrue. Rather, I suspect he did not want to go to the police station because he was

---

[11] Incidentally, if Evans was fabricating a story to implicate defendant, I would have expected him to claim to have seen defendant hide the revolver in the bedroom. That he did not claim to know what defendant did with the revolver enhances his credibility.

involved in drug dealing and did not want to be questioned. Finally, I found Harding's claim that he happened to run into defendant on some unknown date after March 17, 2018, and that defendant threatened him with a gun to lack credibility.

Nevertheless, I found Harding's testimony regarding defendant's possession of the firearm to be credible because it was consistent with Evans' testimony and the other evidence I believe. I find it consistent with Lyon being so frightened as to call the police to her drug paraphernalia-infested house despite her being on probation. I find it consistent with there being a second man in a ski mask in the residence and two firearms recovered from the house. And the government made Harding no promises and gave him no benefits for testifying and did not threaten him with prosecution if he did not testify.

To be sure, there were many inconsistencies in the testimony between Evans and Harding and with other evidence. Evans said defendant went in and out of the house five or six times; Harding said only once. Defendant admitted to going in and out of the house only once. Evans said he held Lyon's dog during the robbery and arrival by police; Harding said the dog was in the basement. Evans said he obtained keys to drive a borrowed vehicle, possibly Harding's truck, to the store; Harding stated that his truck started with a screwdriver. Evans stated Harding's truck started with keys. Evans said his mother brought him to Lyon's house on the evening of March 16, 2018; Harding said that Evans drove them both to Lyon's house that evening in Harding's truck. All of these inconsistencies, however, relate to collateral facts not directly material to the question of whether defendant knowingly possessed the revolver. Given the shocking event of an armed robbery, it is also not surprising that the witnesses do not have perfect recall of the events.

Defendant made much of Evans' assertion that he did not know Harding, when Harding testified that they knew each other for three or four years. I did not find this

evidence troubling. Whenever a lawyer asked Evans a direct question about his contact with Harding, Evans' answers were consistent with Harding's description of their relationship. Evans testified that he knew Harding, they called each other names, Evans worked on cars for Harding and drove Harding around for money. Harding likewise described a relationship with Evans that was familiar, but not close. For example, Harding knew Evans thought himself a "fix-it" guy and tried to perform plumbing repairs, but Harding did not know the nature of Evans' disability and did not know Evans was under a guardianship.

I found it noteworthy that, after police arrived at the house, Harding, Evans, and Webber did not immediately point the finger at defendant and the other black male. According to Officer Idle, only Lyon accused defendant of having a firearm. I would have expected that, once rescued by the police, the other victims of an armed house invasion and attempted robbery would have been quick to point out their assailants to the police. Although the lack of an instant accusation seems inconsistent with defendant and the other black male being guilty, I also recognize that people react inconsistently in crises. Evans stated that he was shocked by the events, as would be expected. It is also very possible, particularly with regard to Harding, that one or more of the victims were hesitant to say anything to police when the motive for the robbery was drug-related. Whatever the case, I do not find the lack of the response I would expect to overcome all of the other evidence that establishes defendant's guilt.

Defendant would have me believe that Evans and Harding completely fabricated the story that defendant was there with another man to rob them. Defendant's theory is that the revolver belonged to Harding and that Harding is lying to avoid a criminal charge and Evans is lying to aid Harding. Although this is possible, I do not find it likely. First, other than defendant's claim, there was nothing else in the evidence tying Harding to the firearms. Evans gave his statement to the police first; Harding called the police

station later.  Had it been the other way around, I would have found it more possible that Harding made up a story and got Evans to go along with it.  If find it very unlikely that Evans came up with a story and then got Harding to adopt it.

Second, the evidence did not show that Harding and Evans had a reason to know that they would have to come up with an explanation for the firearms.  The evidence did not show that either Evans or Harding was present in the house when Officer Idle discovered the pistol or that they were aware that officers had applied for a search warrant.  No officer apparently confronted either Evans or Harding with discovery of a firearm in the house, particularly the revolver.  The evidence showed that neither was present when officers conducted the search of the house that revealed the revolver.

Third, nothing in the evidence suggested that Evans and Harding had the opportunity to concoct a false story, let alone that they did so.  After the police arrived Evans' mother drove Evans from the house to the police station where Evans gave a statement to police about the events.  Harding drove his own truck from Lyon's house, giving Webber a ride.  There was no time when, or place where, Evans and Harding could have conspired to concoct a false story.

Finally, it seems implausible that if the firearms belonged to Harding, that Harding and Evans would conclude that the best way to get Harding out of trouble would be to blame defendant.  Even if Harding and Evans had a motive and opportunity to come up with a false story and even if they thought officers might search the house and might find the firearms, common sense tells me that they would have more likely simply denied any knowledge of the firearms as opposed to taking on the affirmative responsibility of trying to convince the police that an innocent person possessed the firearms.  The Court regularly instructs jurors to use their common sense in drawing deductions from the evidence.  *See* EIGHTH CIRCUIT MODEL CRIMINAL INSTRUCTION 101 ("You may use reason and common sense to draw deductions or conclusions from facts which have been

established by the evidence."). As fact-finder, I, too, may use reason and common sense to draw deductions from the evidence. I do not find it reasonable to believe that Harding and Evans would choose to fabricate a story accusing defendant of possessing a firearm. It would have been much more likely and reasonable to believe that they would have simply claimed to know nothing about the firearms. Fabricating a story that the firearms belonged to someone else carries risks that mere denial of knowledge do not. For all Evans and Harding knew, for example, officers could have recovered Harding's fingerprints from the firearms. That would have been completely inconsistent with the statements they made placing the firearms only in the hands of defendant and the other black male.

The existence of the other black male also makes defendant's version of events unreasonable to believe. Defendant claims to have seen a male in the kitchen of the house wearing a ski mask. He claims to have concluded that the male was a hitman for Harding. I find this explanation implausible. The evidence did not establish that Harding was a major drug dealer or, even if he was, that he employed hitmen. Rather, the existence of the other male with a ski mask, and the recovery of two firearms from the house, is much more consistent with defendant and a cohort entering the house to rob the occupants.

Certainly, the evidence of the other male was undeveloped. Based on the totality of the testimony, I conclude that the second black male started inside the house when officers first arrived. Even defendant, in his statement to Officer O'Brien, placed the other male wearing a ski mask in the house. Where, exactly, the other male was located inside the house when officers first arrived was not clear from the evidence. Webber, who might have shed light on this issue, did not testify. Officer Idle apparently did not see the other male. Yet, at some point that second black male ended up outside. Exactly how and when he moved outside was also unclear from the evidence. Both Evans and

Harding said he slipped out the front door after officers arrived, although neither seems to have known exactly how it happened. The second black male had a brief encounter with Officer Schrader outside of the house, then ran from the scene and was never apprehended. Officer Schrader, who entered the house with Officer Idle and was then outside talking to the other male, might have been able to clarify this issue, but he did not testify.

Wherever exactly the other black male was in the house and however he got outside the house after police arrived, the evidence is clear that there was a second black male who was wearing a ski mask inside the house, and that male fled from the scene. That evidence is consistent with the conclusion that two armed males entered the house to rob the occupants, that defendant was one of them, and the other got away. That evidence is not consistent with the defense theory that the other male was somehow tied to Harding.

Finally, defendant's statements, although largely self-exculpatory, were incriminating in context. Defendant admitted buying methamphetamine from Harding. This admission rings true and would explain what I found to be Harding's unbelievable denial of knowing anything about the drugs or scales in the house. That defendant bought methamphetamine from Harding, however, also provided a motive to rob Harding of drugs and drug proceeds. It is also possible that the motive for defendant's possession of the firearm, as defendant claims, was because he had a dispute with Harding regarding the drugs Harding sold him. Either way, a drug relationship between defendant and Harding increases the likelihood defendant tried to rob Harding than if that drug connection was absent.

I also find defendant's story of handling the firearm as an explanation for why his fingerprints may be on the firearm as incriminating. Indeed, defendant's admission to handling the revolver alone would be sufficient to find him guilty of the crime of possession of a firearm as a felon. I find that his admission is not alone sufficient to find

him guilty of the crime alleged in the indictment in this case, however, because the date and location of when it allegedly occurred was not established. Thus, I cannot find that the alleged possession took place in the Northern District of Iowa or within a reasonable time period of the date alleged in the indictment based on this statement alone.[12]

In any event, I do not believe defendant's story about previously handling the revolver. Rather, I find it more likely that defendant was worried that his fingerprints would be found on the revolver and came up with the explanation that he handled the revolver to explain away his fingerprints. There was no other evidence that defendant and Harding jointly used drugs together, or that they had such a friendly relationship that Harding would be passing his firearms around for inspection by defendant. According to defendant, he was a mere drug customer of Harding and one with whom he had a dispute over drug quantity. That relationship is not consistent with defendant's explanation for when and how he might have touched Harding's revolver. Thus, I find defendant's false, partially exculpatory story about handling the revolver to be incriminating. *Cf. United States v. Walker*, 393 F.3d 842, 847 (8th Cir. 2005) (holding that defendant's lying to arresting officers supported knowing possession of firearm); *United States v. Hudson*, 717 F.2d 1211, 1215 (8th Cir. 1983) (finding false exculpatory statements are admissible as substantive evidence tending to show guilt).

---

[12] It is true, as the prosecutor urged, that it is reasonable to infer that it took place in Lyon's house and within a few days of March 17, 2018. Indeed, Harding testified that he had only met defendant once, a few days before March 17, 2018, in Lyon's house. Nevertheless, the government presented no evidence corroborating defendant's possession of the firearm on that date. Therefore, I am unwilling to convict defendant based on what I believe to be a false statement about possession on some prior date absent any corroborating evidence.

## VI.  CONCLUSION

Considering the evidence in the light most favorable to the government, I deny defendant's motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure.   Based on the totality of the evidence, I find beyond a reasonable doubt that defendant is guilty of the crime of possession of a firearm by a prohibited person, in violation of Title 18, United States Code, Sections 922(g)(1) & (9), as charged in Count 1 of the indictment.

The Court will set this case for sentencing on a later date by separate order.   The Court orders the preparation of a presentence investigation report.   Defendant will remain in custody of the United States Marshal pending sentencing.

**IT IS SO ORDERED** this 22nd day of May, 2019.


_____
C.J. Williams
United States District Judge
Northern District of Iowa